*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVID NELSON RICHTER,

        Defendant-Appellant.

UNPUBLISHED
September 22, 2022

No. 355577
Monroe Circuit Court
LC No. 19-245364-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT STEVEN WESTFIELD,

        Defendant-Appellant.

No. 355578
Monroe Circuit Court
LC No. 19-245363-FC

---

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In these consolidated appeals,[1] defendants appeal as of right their jury trial convictions of first-degree felony murder, MCL 750.316(1)(b). Both defendants were sentenced as fourth-offense habitual offenders, MCL 769.12, to life imprisonment without parole. In Docket No. 355577, we conclude that there was insufficient evidence to support the felony-murder conviction if it was based on the predicate felony of larceny rather than on the predicate felony of unlawful imprisonment—which we cannot determine—and thus, we vacate defendant David Nelson

---

[1] *People v Richter*, unpublished order of the Court of Appeals, entered December 1, 2020 (Docket Nos. 355577 and 355578).

Richter's felony-murder conviction and sentence, and remand for a new trial.[2]  In Docket No. 355578, we conclude that the trial court erred by admitting a toxicology report in violation of the Confrontation Clause and that the prosecution has not established beyond a reasonable doubt that the error was harmless.  We also conclude that a specific unanimity jury instruction was required with regard to the alternative predicate felony theories supporting the charge of felony murder, i.e., larceny and unlawful imprisonment—although we ultimately conclude that there was insufficient evidence to support a felony-murder conviction based on the predicate felony of larceny. Therefore, we vacate Robert Steven Westfield's felony-murder conviction and sentence, and remand for a new trial.

## I.  BACKGROUND

This case arises from the death of Hunter Guthrie in April 2019.  The prosecution's theory of the case was that Guthrie sold drugs for defendants and was supposed to do so at a party in Hudson, Michigan, on April 13, 2019.  When Guthrie became overly intoxicated at the party and neglected his job, Westfield beat Guthrie in the backseat of Westfield's vehicle, thereby causing Guthrie's death.  Defendants then disposed of his body at an abandoned home in Detroit on April 14, 2019, and returned to that location on April 18, 2019, to burn the home to the ground so as to destroy the evidence of their crime.  After defendants were arrested, a white Nissan Versa rented to Westfield was discovered with substantial blood stains in the garage of a home on Remembrance Road, where defendants had been staying.  The prosecution also theorized that defendants murdered Guthrie in the course of committing larceny—specifically, larceny of Guthrie's watch, suitcase, or security camera—or unlawful imprisonment when they held him in the car naked, bloodied, and injured.

The prosecution presented voluminous evidence during the six-day jury trial, including testimony about Guthrie's activities before and during the party, previous testimony from a witness who left the party with defendants and Guthrie, and cell phone evidence reflecting activity consistent with the timeline outlined by the prosecution.  There was also substantial scientific evidence indicating that blood discovered in Westfield's vehicle belonged to Guthrie.  Notably, however, the prosecution was unable to offer direct evidence of Guthrie's cause of death because his body was severely damaged by fire.

Both defendants admitted leaving the party with Guthrie and that a fistfight occurred between Guthrie and Westfield on the trip from Hudson to Monroe.  But they asserted that Guthrie was fine when they dropped him off in Monroe and that they did not see him again thereafter. Defendants also provided, with varying degrees of detail, innocent explanations for their arguably incriminating behavior in the days following the party.

---

[2] Because the jury verdict form only gave the jury the option to convict on "Felony Murder," without distinguishing the predicate offense(s) supporting the verdict—larceny, unlawful imprisonment, or both—we are unable to conclude that sufficient evidence supported the felony-murder conviction.

## II. RICHTER'S CLAIMS OF ERROR (DOCKET NO. 355577)

### A. CROSS-EXAMINATION OF NATASHA WERLEY

Richter first argues that the trial court violated the Confrontation Clause by admitting previous testimony from Natasha Werley without permitting cross-examination at trial. We agree that the trial court erred by precluding cross-examination, but the error was harmless beyond a reasonable doubt.

"Whether a defendant's Sixth Amendment right of confrontation has been violated is a question of constitutional law that this Court reviews de novo." *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

"The Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]' " *Id.* at 227, quoting US Const, Am VI (alterations in original). "[W]hen a declarant appears at trial for cross-examination, the Confrontation Clause does not place any constraints on the use of a prior testimonial statement, and . . . the Clause does not bar the admission of a prior testimonial statement 'so long as the declarant is present at trial to defend or explain it.' " *People v Sardy (On Remand)*, 318 Mich App 558, 563; 899 NW2d 107 (2017), quoting *Crawford v Washington*, 541 US 36, 59 n 9; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Even when a witness is "unavailable" under MRE 804(a)(3) for lack of memory regarding the subject matter, that witness is still available for purposes of the Confrontation Clause if the witness appears at trial. *Sardy*, 318 Mich App at 565. Consequently, as long as the witness testifies on cross-examination at trial, there is no constitutional bar to use of the witness's earlier testimony. *Id.*

In this case, Werley appeared at trial. She testified on direct examination that she could not remember the night in question clearly. She continued to assert a lack of memory regarding many of the events that occurred that evening or in the early morning hours the next day. For instance, she could not remember whose room she was seen entering in the Baymont Inn surveillance video, who she left Baymont Inn with, who drove to the party, what time she arrived at or left the party, anything that happened between Guthrie and Westfield in the car, or whether Richter said anything to her in the car. She even indicated that although she recalled testifying before, she had no memory of what she was asked or how she answered. The prosecution asked her specifically if she recalled testifying that Westfield beat up Guthrie in the car, and Werley responded that she did not remember that happening or previously testifying to that effect. She likewise recalled being interviewed by law enforcement, but had no memory of what occurred during the interview. On the prosecution's motion, the trial court declared Werley unavailable and allowed her preliminary examination testimony to be played for the jury. Werley's previous testimony included extensive cross-examination on behalf of each defendant, but further cross-examination at trial was not permitted.

This case is analogous to *Sardy*. The defendant in *Sardy* was convicted of two counts of second-degree criminal sexual conduct (CSC-II). *Id.* at 561. The victim testified at trial about "foundational and peripheral matters, but could not recall matters pertaining to the two acts of CSC-II." *Id.* at 562. The trial court therefore declared the victim unavailable and admitted her preliminary examination testimony describing the offenses. *Id.* at 561-562. The defendant was

-3-

allowed to cross-examine the victim at trial, but only about those topics she addressed in her direct-examination, "essentially precluding defendant from exploring the CSC-II accusations made by the victim and her then-current lack of recall or memory." *Id*. at 562. This Court concluded that the victim was available in the constitutional sense and that the trial court erred by not allowing the defendant to fully cross-examine her at trial. *Id*. at 563. The limitations imposed on cross-examination violated the Confrontation Clause and deprived the defendant the opportunity to potentially undermine the entirety of the CSC-II charges. *Id*. at 566.

*Sardy* makes clear that the trial court erred by barring defendants from cross-examining Werley at trial, as her memory loss did not make her unavailable for purposes of the Confrontation Clause. This Court applies harmless error analysis to Confrontation Clause errors. *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005). "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010) (quotation marks and citation omitted; alteration in original). The beneficiary of a preserved constitutional error bears the burden under this harmless-error test. *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020).

The error in *Sardy* required reversal because the victim's preliminary examination testimony was the only evidence supporting the criminal sexual conduct convictions. *Sardy*, 318 Mich App at 561-562, 565. In contrast, there was ample other evidence supporting Richter's conviction in this case. Richter himself testified that Guthrie and Westfield got into a fistfight on the way back from the party, and Westfield likewise confirmed the fight during his second interrogation. The details of Werley's testimony differed in some respects, but the general nature of her narrative was consistent with Richter's recollection of the events surrounding the April 13, 2019 party. Although both defendants maintained that Guthrie remained conscious throughout the car ride and was undoubtedly alive when they dropped him off at his home, the wide-spread blood in the vehicle implies that the extent of his injuries was more serious than either defendant acknowledged. Westfield's cell phone data also placed him in the vicinity of the fire on Liebold Street at the time it was started. While there was a gap in Richter's cell phone data at that time, records from a few hours earlier suggest that he was traveling with Westfield and may have turned his phone off. Considering the full record, we are convinced that the trial court's error in precluding cross-examination of Werley at trial was harmless beyond a reasonable doubt.

## B. SUFFICIENCY OF THE EVIDENCE

Richter next raises several arguments challenging the sufficiency of the prosecution's evidence. For the most part, these arguments are unavailing. However, we agree that there was insufficient evidence that Guthrie was killed while Richter was committing, attempting to commit, or assisting in the commission of a larceny. Although the prosecution relied on unlawful imprisonment as an alternative predicate felony and presented sufficient evidence in support of that theory, we cannot determine from the record whether the guilty verdict on the charge of felony murder was premised on the predicate felony of larceny or unlawful imprisonment. Therefore, Richter is entitled to a new trial.

"When reviewing a defendant's challenge to the sufficiency of the evidence, we review the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could

find the essential elements of the crime were proven beyond a reasonable doubt." *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011). "[C]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id*. (quotation marks and citation omitted). Credibility assessments must be resolved in favor of the jury verdict. *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016).

> To support a conviction for felony murder, the prosecution must establish three elements:
>
> (1) the killing of a person, (2) with the intent to kill, do great bodily harm, or create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of an enumerated felony. [*People v Lane*, 308 Mich App 38, 57-58; 862 NW2d 446 (2014).]

The second element—i.e., the requirement of malice—can be inferred "from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Nowack*, 462 Mich 392, 401; 614 NW2d 78 (2000) (quotation marks and citation omitted). The prosecution in this case proceeded on alternative theories that Guthrie's murder occurred in connection with larceny or unlawful imprisonment, both of which are predicate felonies enumerated in MCL 750.316(1)(b).

Richter argues that there was insufficient evidence that Guthrie died of blunt force trauma because the assistant medical examiner, Dr. Lokman Sung, was unable to identify Guthrie's cause of death. We disagree.

Dr. Sung's findings were inconclusive because of the extensive fire damage to Guthrie's body, which erased all external signs of injury. He did, however, explain that he was unable to detect any disease process or abnormalities in Guthrie's remaining organs that would account for his death, that there was no evidence Guthrie died in the fire, and that the substances in Guthrie's system would not have been fatal individually or in combination with one another. Dr. Sung also explained that blunt force trauma to the living brain ordinarily causes swelling. Although such swelling can typically be seen in an autopsy, Dr. Sung noted that portions of Guthrie's head were consumed by fire, making the skull itself very brittle and effectively eliminating signs of swelling that would be visible but for the fire damage. In the absence of any other likely cause of death, the jury was left with only one likely conclusion—that Guthrie succumbed to blunt force trauma injuries he sustained in the backseat fight with Westfield. The absence of direct evidence regarding Guthrie's cause of death is not dispositive, as the prosecution is not obligated to disprove alternative theories consistent with innocence, *Nowack*, 462 Mich at 400, and circumstantial evidence can be sufficient to establish the essential elements beyond a reasonable doubt, *Williams*, 294 Mich App at 471.

Richter next argues that there was insufficient evidence that he killed Guthrie or aided and abetted the killing. We disagree.

"A person who aids or abets the commission of a crime may be convicted and punished as if he directly committed the offense." *People v Izarraras-Placante*, 246 Mich App 490, 495; 633

NW2d 18 (2001). When the prosecution advances an aiding and abetting theory of felony murder it must prove that the defendant

> (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony. [*People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003).]

"Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or abetted in the commission of the crime." *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999).

Werley testified that she was frightened by what transpired in the backseat on the way home from the party and that Richter tried to soothe her nerves by rubbing her shoulder and telling her not to watch. He also told her not to say anything. These acts amount to more than "mere presence." But for Richter's calming efforts, the frightened Werley may have asked Westfield to stop, attempted to signal passing vehicles, or taken other steps to end the conflict. Richter assisted Westfield by running interference with Werley and ensuring that she would not intervene in the beating that resulted in Guthrie's death. Additionally, by continuing to drive the vehicle during the beating, Richter made it all but impossible for Guthrie to safely escape the altercation. He therefore aided and abetted Westfield in killing Guthrie.

Richter next argues there was insufficient evidence that Guthrie was killed while Richter was committing, attempting to commit, or assisting in the commission of either of the predicate offenses supporting the charge of felony murder, i.e., larceny or unlawful imprisonment. We agree as to the predicate offense of larceny, but disagree with regard to the predicate offense of unlawful imprisonment.

Unlawful imprisonment occurs when a person "knowingly restrains another person" if "[t]he person is restrained by means of a weapon or dangerous instrument," "[t]he restrained person is secretly confined," or "[t]he person was restrained to facilitate the commission of another felony or to facilitate the flight after commission of another felony." *People v Railer*, 288 Mich App 213, 217; 792 NW2d 776 (2010), quoting MCL 750.349b(1)(a) through (c). The Legislature defined "restrain" as meaning "to forcibly restrict a person's movement or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). "The restraint does not need to exist for any particular length of time and may be related or incidental to the commission of other criminal acts." *Id*. For purposes of MCL 750.349b(1)(b), a person is secretly confined if the confinement or location of the restrained person is kept secret. MCL 750.349b(3)(b)(*i*) and (*ii*).

Werley testified that Guthrie was wearing clothes when he got in the car, but his clothes were removed at some unknown point during the return trip to Monroe. Assuming the jury credited this testimony, it could also infer that Guthrie remained unclothed thereafter and that his clothes were burned beyond recognition in the firepit at the Remembrance residence. Without clothing, Guthrie could have felt unable to escape the confines of the vehicle, especially while inebriated

and injured. Additionally, there was ample evidence that all or part of Guthrie's body was in the trunk of the vehicle at some point, further restricting his freedom of movement. During the period in which Guthrie was in the trunk, his confinement or location would not be readily apparent. The circumstances of Guthrie's transition into the trunk were disputed; Richter asserted that he helped Guthrie into the trunk area when they pulled over after the fight, while Westfield said he and Guthrie dropped part of the backseat to open the trunk area while they were driving. Although both posited that Guthrie was a willing participant in this decision, the jury did not have to believe their self-serving claims and could have, instead, concluded that no one would voluntarily choose to travel in the trunk, even in an extremely inebriated state. And if the jury believed that Westfield moved Guthrie during the trip, it could again conclude that Richter assisted in the unlawful imprisonment by stopping Werley from interfering in what was happening in the backseat and limiting Guthrie's ability to escape by continuing to drive the vehicle. If the jury believed that Richter helped move Guthrie into the trunk, it could conclude that he directly assisted in Guthrie's unlawful imprisonment by moving him into a location where his confinement would remain a secret.

Felony murder can also occur in the commission of "larceny of any kind." MCL 750.316(1)(b). The Legislature has codified a number of larceny offenses at MCL 750.356 to MCL 750.367c, but has never provided a statutory definition for the term larceny. *People v March*, 499 Mich 389, 399-400; 886 NW2d 396 (2016). Consequently, Michigan Courts have turned to the common law to determine the general elements of "simple larceny," which requires "(a) a trespassory taking and (b) the carrying away (c) of the personal property (d) of another (e) with intent to steal that property." *Id*. at 401.

Concerning larceny as the predicate to felony murder, Richter emphasizes the lack of evidence connecting Guthrie's death with a larceny. To qualify as felony murder, the killing must occur "during the uninterrupted chain of events surrounding the commission of the predicate felony." *People v Gillis*, 474 Mich 105, 120-121; 712 NW2d 419 (2006). Indeed, "to qualify as felony murder, the homicide must be incident to the felony and associated with it as one of its hazards." *Id*. at 127. The time and place of the predicate felony and killing are relevant factors, but not dispositive. *Id*. at 127-129. The fact-finder should therefore consider whether a causal connection exists between the murder and predicate felony. *Id*. at 130.

We agree there was insufficient evidence that Guthrie was killed while Richter was committing, attempting to commit, or assisting in the commission of a larceny. There was evidence of three larcenous events: Richter took Guthrie's watch upon first arriving at the party, Richter removed Guthrie's suitcase from the Baymont Inn, and Guthrie's Canary camera was discovered at the Remembrance residence in the jumble of cleaning supplies outside Westfield's vehicle.

Richter took Guthrie's watch at the party, long before there was any thought of Guthrie leaving the party with defendants. There was no evidence offered to suggest that Richter intended that Guthrie be harmed when he took the watch or that death or great bodily harm was a probable result of doing so. To the contrary, Guthrie was drunk on the ground when Richter took the watch and offered no resistance. Guthrie left the party with defendants at the urging of the party's security staff, so it would be unreasonable to infer that defendants took Guthrie with them in an effort to cover up the theft of the watch.

The only direct evidence of the impetus for the fight between Guthrie and Westfield indicated that the fight broke out because Guthrie was spitting in Westfield's rental vehicle. The prosecution argued that the jury could infer from the circumstantial evidence that defendants killed Guthrie because he failed to sell drugs for them at the party. Even if the jury accepted this theory, it lacks the necessary connection to support a felony-murder conviction predicated on larceny of Guthrie's suitcase or camera. The logical inference from the circumstantial evidence is that Guthrie's suitcase and camera were taken in an attempt to cover defendants' tracks or mislead the investigation into his disappearance. Although deaths that are occasioned by a defendant's postpredicate-offense acts undertaken in an attempt to evade detection or arrest are typically considered to be within the uninterrupted chain of events surrounding the predicate felony, see generally *Gillis*, 474 Mich 105 (describing extensive caselaw regarding deaths occurring after predicate felonies), we have found no authority for the opposite notion, i.e., that a felony committed for the purpose of evading criminal liability for a murder can satisfy the requirements of felony murder. To the contrary, this Court has previously held that "the felony-murder doctrine will not apply if the intent to steal property of the victim was not formed until after the homicide." *People v Brannon*, 194 Mich App 121, 125; 486 NW2d 83 (1992).

To characterize the circumstances at hand as felony murder puts the cart before the horse. The felony-murder statute "operates only to elevate a second-degree murder to first-degree murder if it was committed in the commission of one of the enumerated felonies." *People v Reichard*, 505 Mich 81, 87; 949 NW2d 64 (2020). As such, "the homicide must be incident to the felony and associated with it as one of its hazards." *Gillis*, 474 Mich at 127 (quotation marks and citation omitted). In this case, the evidence suggests the opposite: that the larceny was incident to the homicide.

In addition to concluding there was insufficient evidence that Guthrie was killed while Richter was committing, attempting to commit, or assisting in the commission of a larceny, we also conclude that Richter is entitled to appellate relief because we cannot determine if the error was harmless beyond a reasonable doubt. See *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008) ("Even a preserved, constitutional error is generally not ground for reversal if the prosecutor proves that the error was harmless beyond a reasonable doubt.").

To secure a conviction on the charge of felony murder, due process required the prosecution to prove every element beyond a reasonable doubt. *People v Oros*, 502 Mich 229, 239 n 3; 917 NW2d 559 (2018). The prosecution presented two theories in support of the third element for felony murder: that Guthrie was killed while Richter was committing, attempting to commit, or aiding and abetting in the commission of the predicate offense of (1) larceny, or (2) unlawful imprisonment. If there had been sufficient evidence to support *both* theories related to the predicate offenses, Richter's felony-murder conviction would be affirmed. See, e.g., *People v Sammons*, 191 Mich App 351, 372; 478 NW2d 901 (1991) ("Where a defendant's conviction may be based on one of two theories, both of which are supported by sufficient evidence, the conviction need not be reversed when the jury fails to specify the theory on which it based its decision."). But there was not sufficient evidence to support a felony-murder conviction based on the predicate offense of larceny. If the jury found Richter guilty of felony murder based only on the predicate offense of unlawful imprisonment, we could conclude that the error of submitting the larceny theory to the jury was harmless beyond a reasonable doubt. However, there is no way for us to determine which felony served as the predicate felony for Richter's felony-murder conviction. The

jury verdict form merely gave the jury the option of "Felony Murder" without distinguishing the predicate offense(s) supporting the verdict—larceny, unlawful imprisonment, or both.

In *People v Gilbert*, 55 Mich App 168, 174; 222 NW2d 305 (1974), this Court held:

When the defendant stands convicted on one of two theories, one of which is permissible and one of which is not, the inability to say for sure on which the conviction rests demands reversal.

Similarly, in *People v Olsson*, 56 Mich App 500; 224 NW2d 691 (1974), the defendant was charged in one count with both first-degree murder and felony murder. *Id*. at 503. This Court concluded that there was sufficient evidence to submit the charge of first-degree murder to the jury, but there was not sufficient evidence to submit the charge of felony murder to the jury. *Id*. at 504. However, the jury verdict merely indicated that defendant was guilty of murder without indicating on which alternative theory of murder, or that the verdict was based on both theories. *Id*. at 505. This Court concluded that it was "impossible" to determine whether the jury convicted the defendant on the insufficiently supported charge of felony murder. *Id*. And because this Court could not "conclusively state that the jury did not convict [the] defendant of [the felony murder] charge," the defendant was entitled "to a reversal of his conviction and a new trial." *Id*. While both the *Olsson* and *Gilbert* cases were decided before November 1, 1990, and thus are not precedentially binding on this Court, we find the reasoning persuasive and applicable under the circumstances of this case. See MCR 7.215(J)(1). Due process requires that sufficient evidence support defendant's felony-murder conviction, and we cannot conclusively make that determination in this case; accordingly, we vacate Richter's conviction and sentence on the charge of felony murder, and remand for a new trial.

Richter's final challenge to the sufficiency of the evidence concerns the appropriate venue for his prosecution. "Venue is a part of every criminal prosecution and must be proved by the prosecutor beyond a reasonable doubt." *People v Webbs*, 263 Mich App 531, 533; 689 NW2d 163 (2004). MCL 762.8 provides:

Whenever a felony consists or is the culmination of 2 or more acts done in the perpetration of that felony, the felony may be prosecuted in any county where any of those acts were committed or in any county that the defendant intended the felony or the acts done in perpetration of the felony to have an effect.

Additionally, "[i]f any mortal wound shall be given or other violence or injury shall be inflicted, . . . in 1 county by means whereof death shall ensue in another county, the offense may be prosecuted and punished in either county." MCL 762.5.

Richter argues that there was insufficient evidence that any of the acts leading to Guthrie's death took place in Monroe County. We disagree. The prosecution presented evidence that Westfield beat Guthrie in the car as they traveled from Hudson (Lenawee County) to the city of Monroe (Monroe County). As Richter points out, there is no evidence to suggest that the beating occurred in Monroe County, rather than Lenawee County. But Werley and Richter both testified that Guthrie was alive when they arrived at the Baymont Inn in Monroe in the early morning hours of April 14, 2019. As no one saw Guthrie again after that time, the jury could reasonably infer that he died shortly thereafter. There was also evidence that Guthrie's phone received calls that

went to voicemail in the vicinity of the Days Inn in Monroe between 10:30 a.m. and 11:00 a.m. on April 14, 2019. Thereafter, Richter's phone activity suggested that he and Westfield stopped in Detroit in the early evening on April 14, 2019, in the general area of Liebold Street before traveling to Saginaw. The jury could infer from this evidence that Guthrie died in Monroe and that defendants hid his body at the abandoned home on Liebold Street before going to pick up Richter's wife in Saginaw. Thus, even if there was insufficient evidence to find beyond a reasonable doubt that Westfield inflicted the injuries that proved fatal in Monroe County, there was sufficient evidence that Guthrie died in Monroe, thereby making venue in Monroe County appropriate under MCL 762.5.

## C. JUROR BIAS

Richter's final claim of error concerns the alleged bias of a member of the jury. Because this matter is remanded for a new trial and the resolution of this issue has no significance to that new trial, the issue is rendered moot and will not be addressed.

## III. WESTFIELD'S CLAIMS OF ERROR (DOCKET NO. 355578)

## A. DENIAL OF MOTION FOR INVESTIGATOR

Westfield argues on appeal that the trial court erred by denying his motion for a court-appointed investigator. We disagree.

Whether a trial court's failure to appoint an expert violated the defendant's right to due process is a question of constitutional law reviewed de novo. *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018).

In order to be entitled to appointment of an expert, the defendant "must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial."[3] *Id*. at 228 (quotation marks and citation omitted). The information necessary to meet the reasonable-probability standard is necessarily case specific, but in most scenarios the defendant must at least "inform the court of the nature of the prosecution's case and how the requested expert would be

---

[3] *Kennedy*, 502 Mich at 211, addressed a claim of error regarding a trial court's refusal to appoint a DNA expert at public expense. The Court recognized that in criminal prosecutions the constitutional guarantee of due process requires the government to ensure that an indigent defendant has the tools needed to present his or defense. *Id*. at 214. The *Kennedy* Court relied on a due-process analysis conducted by the United States Supreme Court in a case involving a psychiatric expert, but noted that the analysis applied equally to other experts. *Id*. at 218-219. The Court then adopted the reasonable-probability standard as the test for deciding whether a defendant established entitlement to appointment of an expert at government expense. *Id*. at 225-228. Although the Court did not indicate whether the same test would apply to an indigent defendant's request for an investigator, we see no reason to treat requests for an investigator differently. In appropriate circumstances an investigator may be just as necessary to proper development of an effective defense as would be an expert.

useful," and also identify the specific type of expert desired. *People v Propp (On Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 343255); slip op at 3-4, lv pending (quotation marks and citation omitted). In *Propp*, this Court determined on remand that the defendant established that an expert would be of assistance to the defense by explaining that he was charged with murder, there was evidence that the victim died of strangulation, that he planned to assert a relatively unknown defense of erotic asphyxiation, and that his proposed expert would testify about that practice and the associated risks of death. *Id*. at ___; slip op at 4. In reaching this decision, the Court agreed that the defendant's burden of production regarding the first portion of the reasonable-probability test was not "an overly burdensome one." *Id*. (quotation marks and citation omitted). Nonetheless, the Court did not find a reasonable probability that denial of an expert rendered the trial fundamentally unfair because the defense theory, while uncommon, was conceptually simple and did not require explanation by way of expert testimony. *Id*. at ___; slip op at 4-5.

Westfield's written motion for appointment of an investigator explained that he was charged with open murder on the basis of allegations that took place in three different counties. More specifically, Westfield indicated that there would be evidence that Guthrie and defendants attended a large barn party, where there was "a multitude of partygoers" who might be able to clarify who interacted with Guthrie, the nature of those interactions, and "the veracity or accuracy of certain witness testimony . . . ." Westfield further alleged that numerous people were at the scene of the fire as it was being extinguished, and that an investigator would be able to identify those witnesses, as well as nearby residents, and gather information about what they observed. Additionally, Westfield opined generally that an independent investigator might be able to discover exculpatory evidence that was previously overlooked. Westfield proposed a specific investigator and attached the investigator's curriculum vitae to his motion.

Considering only Westfield's written motion, he did not present sufficient facts to establish a reasonable probability an investigator would be of assistance to the defense. Despite identifying the general nature of the case and implying that an investigator was needed because of the large number of potential witnesses, Westfield's motion lacked case-specific reasons for appointing an investigator. In nearly every criminal case, a defendant could generally assert that other witnesses *might* have seen or heard something relevant and that exculpatory evidence *might* have been overlooked. We appreciate that it would be all but impossible for Westfield to identify what specific information the investigator would likely discover before receiving the investigator's assistance, but his written motion failed to offer any concrete reason for believing that the materials from the police investigation were incomplete or inaccurate or that any particular witness or circumstance required further exploration.

Westfield's former attorney offered further insight at oral argument, explaining that law enforcement officers spoke with Curtis Richardson, who claimed to have seen a silver Kia in the area of the fire. According to counsel, Richardson described the occupants as two males, approximately 25 years of age, "who looked like they were drug addicts . . . ." Counsel indicated that Richardson's description matched other people associated with the case who were completely unconnected to either defendant. Counsel's oral argument was premised on more than speculation and conjecture, as he identified a specific witness for investigation and explained why further information from that witness might be of assistance to the defense. As noted in *Propp*, the burden of production regarding the probability that an expert would be of assistance is not demanding, *id*.

-11-

at ___; slip op at 4, and counsel's oral argument in support of Westfield's motion was likely sufficient.

But assuming, without deciding, that Westfield demonstrated the first requirement adopted in *Kennedy*, he has not demonstrated a reasonable probability that denial of his request for an investigator resulted in a fundamentally unfair trial. Richardson was identified as a potential witness in four of the five witness lists filed by the prosecution, and this Court can infer from the record that Richardson's statement was provided to defendants in discovery. Although Richardson did not ultimately testify, he was subpoenaed by the prosecution to appear at trial. We can discern no reason on the existing record to conclude that Westfield was denied a fair trial merely because he did not receive a court-appointed investigator to question Richardson. Richardson had already provided a statement, and his whereabouts were clearly known if Westfield wished to question him further to clarify the statement or attempt to elicit additional information.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO INVESTIGATE

Westfield alternatively argues that he was denied the effective assistance of counsel when his trial attorney failed to investigate Richardson or call Richardson as a witness. Westfield has not established entitlement to appellate relief on this basis.

Westfield preserved this issue for review by moving to remand to the trial court for factual development of this claim. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). But because this Court denied Westfield's motion, our review is limited to mistakes apparent from the existing record. See *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018). The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

"In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Id*. at 51. Under the first prong, the defendant bears a heavy burden to overcome the presumption that counsel acted pursuant to a sound trial strategy. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). With respect to the second prong of the test, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Muhammad*, 326 Mich App at 63 (quotation marks and citation omitted). The defendant bears the burden of proof with respect to both requirements and must establish a factual predicate for his or her claim. *Id*.

Westfield argues that he was denied the effective assistance of counsel when his trial attorney failed to investigate Richardson or subpoena Richardson to testify at trial. In support of his claim of error, Westfield relies on an affidavit he obtained from Richardson for purposes of this appeal and an affidavit from appellate counsel describing trial counsel's comments about this issue. Neither of these documents are part of the record on appeal, and both are therefore beyond the scope of this Court's review. See *id*. Limiting our review to the existing record, the extent of defense counsel's investigation of Richardson is not apparent, which leaves us without a factual basis to determine whether trial counsel acted reasonably and pursuant to sound strategy. In other

words, Westfield has not carried his burden of proof regarding this claim of ineffective assistance of counsel.

Moreover, even if we chose to consider Westfield's offers of proof and Richardson's initial police statement, which has been provided by the prosecution but is likewise not part of the existing record, Westfield has still failed to establish that he is entitled to a new trial. A defense attorney is always bound to "make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citations omitted). According to appellate counsel, Westfield's trial counsel said he did not attempt to locate or interview Richardson because he did not have an investigator and the trial court refused to appoint one. Trial counsel also purportedly said that "he had too much going on to have the time to track down and interview Mr. Richardson." This explanation does not reflect reasonable professional judgment, especially when it is clear from the record both Richter's trial attorney and Westfield's former attorney recognized Richardson as a potentially exculpatory witness.

But even if defense counsel's performance was deficient in this regard, Westfield cannot establish a reasonable probability that the outcome would have been different but for his attorney's failure to investigate or subpoena Richardson. Westfield maintains that he was prejudiced by trial counsel's performance because evidence placing others at the scene of the fire in a different vehicle would have cast doubt on the prosecution's case, which was entirely circumstantial. We disagree.

As the prosecution persuasively argues in response to this issue, Richardson's testimony could just as easily have been viewed by the jury as further proof *against* defendants. Richardson initially described the vehicle he saw as a small silver Kia that was approximately five or six years old. In his recent affidavit, Richardson said the vehicle was a 2009 to 2011 body-style gray Kia Rio. Both descriptions could be fairly characterized as referring to a small, light-colored sedan with an older body style. At the relevant time, defendants were traveling in a 2019 white Nissan Versa—also a small, light-colored sedan.

Richardson initially told the police he saw the sedan barreling through debris in the driveway between the two houses that burned down around 6:00 p.m. on "Monday," presumably referring to April 15, 2019, i.e., the Monday before the fire. In his affidavit, he asserts that he saw the vehicle at 6:00 p.m. "[a]bout two days before the fire," which would have been Tuesday, April 16, 2019. The prosecution theorized at trial that defendants abandoned Guthrie's body at 1107 Liebold Street on Sunday, April 14, 2019, and presented evidence that Richter's cell phone was in the general geographic location of the fire between 5:40 p.m. and 7:19 p.m. that day. Both defendants confirmed that they were together at that time.

Richardson initially told the police the occupants were two Caucasian males, approximately 25 years old, who "looked like drug addicts." In his affidavit, Richardson said the men were in their mid to late twenties, perhaps "35 years old at most," and that the driver had black greasy hair. At the time of Guthrie's death, Richter was 41 years old and Westfield was 45 years old. Both defendants are Caucasian men and admitted heavy drug use. Additionally, Westfield is seen in his recorded interviews with short dark hair that may very well have looked greasy after the excessive "partying" he engaged in the weekend of April 13, 2019.

Although there are clearly some discrepancies between Richardson's observations and the evidence presented by the prosecution, they primarily involve subjective impressions like apparent age or the make and model of the vehicle that the jury could have interpreted as applying to defendants and Westfield's rental vehicle. The date discrepancy could be chalked up to a failure of memory regarding what seemed like an insignificant event when Richardson observed it, especially in light of the internal inconsistency between his own statements. Moreover, even if the jury accepted the notion that Richardson saw others at the location of the fire on April 15 or 16, 2019, that fact has only minimal potentially exculpatory weight. There was undisputed evidence that Richter's cell phone was in the vicinity of the fire while defendants were together on April 14, 2019, and that Westfield's cell phone connected to towers in that area again days later in the same time frame the fire was started. The evidence also established that defendants were the last people seen with Guthrie, Westfield punched Guthrie several times on the way back from the party, and Guthrie was bleeding in the vehicle. And despite Richter's self-serving explanations for his suspicious behavior after the fact, it is difficult to view his removal of Guthrie's suitcase from Baymont Inn, mysterious acquisition of Guthrie's security camera, car cleaning efforts, and burning of blood-stained items as anything other than attempts to destroy incriminating evidence or otherwise hamper the investigation. Considering the abundant evidence linking defendants to Guthrie's murder, Westfield has not established a reasonable probability of a different outcome but for his attorney's deficient performance.

## C. VOIR DIRE LIMITATION

Westfield next argues that the trial court's preclusion of questions regarding the COVID-19 pandemic during voir dire resulted in a coerced jury verdict. We disagree.

"The scope of voir dire is left to the discretion of the trial court." *People v Taylor*, 195 Mich App 57, 59; 489 NW2d 99 (1992). Discretionary decisions are generally reviewed for an abuse of that discretion, which occurs when the trial court "selects an outcome that falls outside the range of reasonable and principled outcomes." *People v Odom*, 327 Mich App 297, 303; 933 NW2d 719 (2019).

A defendant's right to be tried by an impartial jury is protected, in part, by affording the defendant the ability to remove biased individuals before the jury is impaneled. *Haynes*, ___ Mich App at ___; slip op at 7. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *Id*. (quotation marks and citation omitted). Although a trial court has discretion to limit voir dire, that discretion is not unfettered. *People v Tyburski*, 196 Mich App 576, 585; 494 NW2d 20 (1992), aff'd 445 Mich 606 (1994). The court may not impose limitations that would exclude the discovery of "facts that could be employed in exercising challenges for cause and peremptory challenges." *Id*.

Westfield argues that by disallowing questions about the COVID-19 pandemic, the trial court undermined the value of the jury trial. Westfield reasons that the jury may have convicted him without sufficient evidence of his guilt because the jurors were too distracted by safety concerns, resented Westfield's decision to exercise his right to a jury trial, or were willing to give up honestly held opinions to reduce the growing risk of COVID-19 exposure that would be associated with lengthy deliberations. We disagree. Westfield has not demonstrated, or even suggested, that these general concerns would be an appropriate basis for excusing prospective

jurors peremptorily or for cause. To the extent any of the jurors felt resentment over having to serve on a jury in the midst of a pandemic, there is no reason to believe that their resentment would cause partiality in favor of the prosecution. It was, after all, the prosecution that was responsible for the vast majority of the lengthy 6-day trial. The prosecution called 34 witnesses and presented numerous exhibits. Westfield, in contrast, did not present any evidence, and Richter's short case-in-chief consisted only of his own testimony and brief testimony from his mother.

Furthermore, although the prospective jurors were not asked specifically about matters relating to the pandemic, they were advised of the anticipated length of the trial and whether any health problems would prevent them from serving as jurors. Each of the prospective jurors who raised concerns about the length of the trial were excused, and no one cited potential COVID-19 exposure as a basis to avoid being selected for the jury. The trial court also explained, outside the jury's presence, that only approximately 60 of the 100 prospective jurors were present for voir dire because many people had already been excused on the basis of requests referencing COVID-19 issues. There is simply no reason to believe that the trial court's preclusion of questions about COVID-19 adversely affected Westfield's right to be tried by an impartial jury.

Westfield relies exclusively on caselaw considering whether instructions given to purportedly deadlocked juries were unduly coercive. See *People v Walker*, 504 Mich 267; 934 NW2d 727 (2019); *People v Vettese*, 195 Mich App 235; 489 NW2d 514 (1992); *Jenkins v United States*, 380 US 445; 85 S Ct 1059; 13 L Ed 2d 957 (1965); *United States v Kimmel*, 777 F2d 290 (CA 5, 1985). To the extent that these cases apply in the context of Westfield's voir dire argument, they are factually distinguishable. Coercive instructions were found in only two of these cases, which both involved instructions that implied failure to reach a unanimous verdict was not an option. *Walker*, 504 Mich at 281; *Jenkins*, 380 US at 446. The jury in this case was not deadlocked and the court never implied that a hung jury would not be tolerated. To the contrary, the jurors were properly instructed that they should express their opinions and reasoning during deliberations, keep their minds open, reconsider their opinions if necessary, and attempt to resolve differences of opinion, but should not "give up your honest opinion about the case just because other jurors disagree with you or just for the sake of reaching a verdict." This Court assumes that jurors follow their instructions. *Lane*, 308 Mich App at 57.

## D. TOXICOLOGY REPORT

Westfield next argues that the trial court violated his constitutional right to confront witnesses by admitting a toxicology report without testimony from the author. We agree and further conclude that this error was not harmless beyond a reasonable doubt.

"Whether a defendant's Sixth Amendment right of confrontation has been violated is a question of constitutional law that this Court reviews de novo." *Bruner*, 501 Mich at 226.

"The Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]' " *Id*. at 227, quoting US Const, Am VI (alterations in original). Unless a witness is unavailable and the defendant had a previous opportunity for cross-examination, the Confrontation Clause bars "testimonial statements" of witnesses absent from trial. *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008). "The threshold question for any Confrontation Clause challenge, therefore, is whether

-15-

the proffered evidence is testimonial." *Bruner*, 501 Mich at 227. This question is not always straightforward, as the United States Supreme Court declined to establish a "comprehensive definition" of what statements are deemed "testimonial." *Crawford*, 541 US at 68. Instead, courts have turned to certain factors to determine whether statements beyond the core class of testimonial statements identified in *Crawford* fall within the scope of the Confrontation Clause. For instance, "[a] pretrial statement is testimonial if the declarant should reasonably have expected the statement to be used in a prosecutorial manner and if the statement was made under circumstances that would cause an objective witness reasonably to believe that the statement would be available for use at a later trial." *Dendel*, 289 Mich App at 453, citing *Crawford*, 541 US at 51-52. On the other hand, a statement is nontestimonial if its primary purpose is not for use at a later trial. *People v Nunley*, 491 Mich 686, 706 & n 68; 821 NW2d 642 (2012).

Dr. Sung testified that his autopsy examination alone did not provide sufficient information to determine Guthrie's cause of death because the body had sustained extensive damage in the fire. In order to determine the timing of Guthrie's death in relation to the fire, Dr. Sung considered a toxicology report. The report indicated that there was no carbon monoxide in Guthrie's blood. On the basis of this fact and the absence of soot in Guthrie's airway, Dr. Sung concluded that Guthrie died before his body was burned in the fire. Dr. Sung further noted that the toxicology report revealed the presence of a number of drugs in Guthrie's system, but none were within a toxic range and they did not contribute to his death. Dr. Sung was unable to determine Guthrie's cause of death, but classified the manner of death as homicide by unspecified means. The toxicology report discussed by Dr. Sung, which was prepared by NMS Labs, was admitted at trial pursuant to a pretrial ruling. The scientist or scientists who analyzed Guthrie's blood sample and prepared the toxicology report were not called as witnesses.

Westfield argues that the admission of the toxicology report under these circumstances violated his right to confront the witnesses against him. We agree. In reaching this conclusion, two cases involving Confrontation Clause challenges raised in similar contexts are particularly helpful.

In *People v Lewis (On Remand)*, 287 Mich App 356, 359; 788 NW2d 461 (2010) (*Lewis I*), vacated in part and aff'd in part 490 Mich 921 (2011), an autopsy report was admitted in a murder trial through the testimony of a medical examiner who neither performed the autopsy nor authored the report. This Court reviewed the United States Supreme Court's then-recent opinion in *Melendez-Diaz v Massachusetts*, 557 US 305, 310; 129 S Ct 2527; 174 L Ed 2d 314 (2009), which held that affidavits by forensic analysts who identified narcotics in a drug-trafficking case were testimonial and could not be admitted without affording the defendant an opportunity to confront the analysts. *Lewis I*, 287 Mich App at 361-362. Highlighting the *Melendez-Diaz* Court's observation that the sole purpose of the affidavits was for use at trial, *Melendez-Diaz*, 557 US at 311, this Court distinguished *Lewis I* from *Melendez-Diaz* on the ground that the challenged autopsy report "was prepared pursuant to a duty imposed by statute."[4] *Lewis I*, 287 Mich App at

---

[4] MCL 52.202(1) requires the county medical examiner or deputy county medical examiner to investigate the cause and manner of death in the following circumstances:

362-363.  The Michigan Supreme Court thereafter vacated this Court's Confrontation Clause analysis and rejected its determination that the autopsy report was not prepared in anticipation of litigation.  *People v Lewis*, 490 Mich 921 (2011) (*Lewis II*).

In *Dendel*, 289 Mich App at 448, the defendant was convicted of second-degree murder for causing the death of her domestic partner.  The prosecution's theory of the case was that the defendant injected her partner with insulin, knowing that it would be impossible to detect in a dead body.  *Id*. at 448-449.  Toxicology testing was conducted by AIT Laboratories at the request of the county medical examiner.  *Id*. at 449-450.  A high-ranking toxicologist from the company testified that there was no glucose in the victim's system, which was consistent with having been injected with insulin.  *Id*.  This Court noted that AIT performed the glucose test at the request of the medical examiner only after the medical examiner reopened the case upon learning of suspicious circumstances that raised questions regarding the defendant's role in the victim's death.  *Id*. at 467-468.  Indeed, the medical examiner requested specific tests, including glucose and insulin testing, because he learned that the victim might have been injected with a fatal dose of insulin.  *Id*. at 468.  This Court determined that the toxicology result regarding the victim's glucose level was testimonial, explaining:

> The medical examiner did not merely delegate to the AIT laboratory an ordinary duty imposed by law: he sought from the lab specific information to investigate the possibility of criminal activity.  Under these circumstances, any statements made in relation to this investigation took on a testimonial character.  Although [the testifying toxicologist said] that toxicological testing is normally performed without any case background and without preconceived notions about what might be found, the testing here was performed in anticipation of a criminal trial, after the medical examiner's original findings had been challenged.  [*Id*.]

This Court's analysis in *Dendel* and the Michigan Supreme Court's rejection of the duty-imposed-by-statute theory in *Lewis II* compel one conclusion: the toxicology report was testimonial and subject to the requirements of the Confrontation Clause.

---

(a) The individual dies by violence.

(b) The individual's death is unexpected.

(c) The individual dies without medical attendance by a physician, or the individual dies while under home hospice care without medical attendance by a physician or a registered nurse, during the 48 hours immediately preceding the time of death, unless the attending physician, if any, is able to determine accurately the cause of death.

(d) The individual dies as the result of an abortion, whether self-induced or otherwise.

Dr. Sung testified that he does not always consider toxicology and determines whether to do so on a case-by-case basis depending on whether the results would likely advance his task of determining the cause and manner of death. He turned to the toxicology report in this case because his physical examination of the body did not enable him to reach a definitive cause of death and to aid his determination of whether Guthrie died before or during the fire. The report also allowed him to conclude that Guthrie did not die from a drug overdose. Ruling out these potentially innocent causes of death was a critical step in Dr. Sung's decision to classify Guthrie's death as a homicide. In other words, he obtained the report for the purpose of confirming or negating the probability of criminal activity. Like in *Lewis II* and *Dendel*, the only logical conclusion is that the toxicology testing was performed in anticipation of trial and that the report detailing the results was testimonial. *Lewis II*, 490 Mich at 921; *Dendel*, 289 Mich App at 468. The toxicology analysis was performed not by Dr. Sung, the witness through whom the report was admitted at trial, but by one or more declarants who did not testify at trial and were not previously subject to cross-examination. Consequently, its admission violated Westfield's right to confront the witnesses against him.

Because this error is constitutional in nature, we must determine whether "[it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Dendel*, 289 Mich App at 475 (quotation marks and citation omitted; alteration in original). "[I]f it is beyond a reasonable doubt that the jury would have convicted defendant on the basis of untainted evidence," the error was harmless and he is not entitled to a new trial. *Id.* The beneficiary of a preserved constitutional error bears the burden under this harmless-error test. *Sammons*, 505 Mich at 56. We are not persuaded that the prosecution can meet this burden.[5]

As noted elsewhere in this opinion, there was substantial evidence supporting defendants' convictions. The evidence was essentially undisputed that Guthrie was last seen in defendants' presence and that Guthrie lost blood after having fought with Westfield. The cell phone evidence was consistent with the prosecution's theory that defendants abandoned Guthrie's body in a vacant home the evening after the party and then returned several days later to set the home on fire. There was also ample evidence that one or both defendants attempted to destroy incriminating evidence, thereby reflecting consciousness of guilt.

However, Dr. Sung's inability to determine the cause of Guthrie's death is highly significant in this case. While it is undisputed that Guthrie and Westfield got in a fight, there was also considerable evidence that Guthrie was staggeringly inebriated just before his death. Guthrie's best friend, Christopher Rafter, testified that Guthrie drank approximately four fifths of liquor that night and was so drunk that he pushed Rafter to the floor at the party. And according to Richter, Guthrie "did some lines" with him at the hotel before the party and asked Richter to find molly for the party. There was also evidence that Richter gave Guthrie Xanax. Rafter did not see Guthrie do any drugs that evening, but he agreed that Guthrie was known to do drugs. Guthrie's ex-girlfriend testified that Guthrie was functional when she first saw him at the party, but was "very messed up" when she saw him an hour later. Hunner Mravec, a bouncer at the party,

---

[5] In fact, the prosecution hangs its hat on its belief that the toxicology report was nontestimonial and did not bother to include a harmless-error argument in its appellate brief.

spent much of the party trying to keep Guthrie in line. When Mravec first encountered Guthrie, he was falling over drunk and his clothes were dirty from having fallen down multiple times. By the time Guthrie left the party with defendants, he was covered in his own urine and vomit. Considering the minimal evidence that Guthrie actually suffered blunt force trauma in the fight with Westfield, the jury could very well have harbored doubts about Guthrie's cause of death or believed it was more likely that he died from an overdose of one or more substances he consumed that night. Without the toxicology evidence, there was little or no basis for the jury to find one cause of death more likely than the other.

Moreover, if Guthrie died from an overdose while with defendants, the jury could still accept the other evidence of defendants' guilt as true without compelling the conclusion that they were guilty of felony murder. Assuming defendants were not responsible for Guthrie's death, their subsequent attempts to dispose of his body and distance themselves from his death could be viewed as actions, however ill-advised, taken in the heat of the moment out of fear that they would be accused of causing his death during the fight. While defendants denied any knowledge of what happened to Guthrie after they dropped him off on April 14, 2019, the jury was not tasked with deciding which competing theory was more credible—the question is always whether the prosecution proved each essential element beyond a reasonable doubt. In other words, the jury did not have to believe defendants in order to find the prosecution's proofs insufficient to establish beyond a reasonable doubt that Westfield killed Guthrie. But for the toxicology report, the prosecution's case-in-chief was much less persuasive, and a reasonable view of the prosecution's proofs could have led the jury to conclude that Westfield did not kill Guthrie and, therefore, that defendants were not guilty of felony murder. Consequently, the erroneous admission of the toxicology report was not harmless beyond a reasonable doubt.[6]

### E. SPECIFIC UNANIMITY INSTRUCTION

In his final claim of error, Westfield argues that the trial court erred by failing to give a specific unanimity instruction to the jury explaining that, to convict him on the charge of felony murder, it had to unanimously agree on which predicate felony Westfield was committing, attempting to commit, or assisting in the commission of when Guthrie was killed. Alternatively, Westfield contends that his trial counsel was ineffective for failing to request such an instruction. We agree.

Westfield did not preserve his direct claim of error by requesting a specific unanimity instruction or objecting to the instructions as provided by the trial court. *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003). We review unpreserved claims of instructional error for plain error affecting substantial rights. *People v Spaulding*, 332 Mich App 638, 652; 957

---

[6] Admission of the toxicology report had the same harmful effect on Richter's trial, but Richter does not raise this issue on appeal, and his trial counsel waived review of this issue below. We have already granted Richter a new trial on other grounds, otherwise we would also grant Richter a new trial because of this error on the basis of ineffective assistance of counsel. See *People v Traver*, 502 Mich 23, 43 n 10; 917 NW2d 260 (2018) (noting that a defendant must establish a valid claim of ineffective assistance to warrant relief for a waived claim of error).

NW2d 843 (2020). "Under the plain error rule, a defendant bears the burden of establishing that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *Wiley*, 324 Mich App at 150-151 (quotation marks and citation omitted). "To establish that a plain error affected substantial rights, there must be a showing of prejudice, i.e., that the error affected the outcome of the lower-court proceedings." *Id*. at 151 (quotation marks and citation omitted). Reversal is warranted "only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Thorpe*, 504 Mich at 252-253. Westfield preserved his related ineffective assistance claim by moving in this Court to remand to the trial court for factual development of this claim. See *Abcumby-Blair*, 335 Mich App at 227. But because this Court denied Westfield's motion, our review is limited to mistakes apparent from the existing record. See *Muhammad*, 326 Mich App at 63.

To protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). "Often, the trial court fulfills that duty by providing the jury with a general instruction on unanimity." *People v Chelmicki*, 305 Mich App 58, 68; 850 NW2d 612 (2014). That is, "if alternative acts allegedly committed by defendant are presented by the state as evidence of the actus reus element of the charged offense, a general instruction to the jury that its decision must be unanimous will be adequate unless 1) the alternative acts are materially distinct (where the acts themselves are conceptually distinct or where either party has offered materially distinct proofs regarding one of the alternatives), or 2) there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt." *Cooks*, 446 Mich at 524.

In this case, the trial court instructed the jury as follows with regard to the requirement of unanimity:

> A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees with that verdict. In the jury room, you'll discuss the case amongst yourselves, but ultimately, each of you will make up your own mind. A verdict must represent the individual considered judgment of each individual juror.

With respect to the elements of felony murder, the court instructed the jury that the prosecution had to prove beyond a reasonable doubt that defendants caused Guthrie's death by blunt force trauma; that they intended to kill, do great bodily harm, or knowingly created a high risk of death or great bodily harm knowing that death or such harm would likely result from their actions; and that when the defendants committed the act causing Guthrie's death, they were committing, attempting to commit, or helping someone else commit larceny of any kind or unlawful imprisonment. The court also explained the possibility of liability as an aider and abettor.

We conclude that a specific unanimity instruction was required in this case. Defendants were charged with felony murder and to support a conviction on that charge the prosecution had to prove both that Guthrie was killed and that he was killed during the course of committing or attempting to commit or assisting in the commission of a felony. See *Lane*, 308 Mich App at 57-58. These criminal acts—the killing and the felony—represent two different elements that must be established beyond a reasonable doubt to support a conviction of felony murder. In this case,

the prosecution proceeded on alternative theories that Guthrie's killing occurred in connection with two predicate felonies, larceny and unlawful imprisonment. It is true that "when a statute lists alternative means of committing an offense, which means in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theories." *People v Gadomski*, 232 Mich App 24, 31; 592 NW2d 75 (1998). But, here, the means of committing the offense of felony murder was alleged to be through the means of separate and distinct criminal offenses—larceny or unlawful imprisonment, which have their own elements that must be established beyond a reasonable doubt. These two felonies are conceptually distinct in character and are not necessarily proven by the same evidence. And as our Supreme Court explained in *Cooks*, 446 Mich at 524, 530, while a general instruction to the jury that its decision must be unanimous is typically adequate, in cases like this where materially distinct alternative acts are at issue or where "there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt," a specific unanimity instruction is mandated.

Here, because of the absence of a specific unanimity instruction, some jurors could have concluded that Westfield killed Guthrie during the course of committing, attempting to commit, or assisting in the commission of a larceny and some jurors could have concluded that Westfield killed Guthrie during the course of committing, attempting to commit, or assisting in the commission of unlawful imprisonment. But the unanimous jury requirement—an indispensable component of our criminal jurisprudence—requires that all of the jurors substantially agree on the factual basis of a defendant's guilt, i.e., the material criminal act or acts committed. See *Cooks*, 446 Mich at 513 n 13. That is especially true in a case of felony murder like this one where the prosecution alleged two very different means by which the killing was accomplished—either by actions involving a larceny or by actions involving an unlawful imprisonment. The jurors were required to reach a unanimous agreement as to which predicate felony Westfield was committing, attempting to commit, or assisting in the commission of at the time Guthrie was killed. In this case—in light of the fact that the jury verdict form did not distinguish between the two theories on which the felony murder charge was based—we cannot conclude that Westfield's felony murder conviction was the result of a unanimous verdict—as mandated by law. See, e.g., MCR 6.410(B).

Further, as discussed above, we have already determined that there was not sufficient evidence to support a conviction on the charge of felony murder based on the predicate offense of larceny. If there had been sufficient evidence to support the felony-murder conviction based on both predicate offenses of larceny and unlawful imprisonment, we may have concluded that the jury instruction error was harmless. But that is not the case here. We conclude that the failure to provide the jury with the specific unanimity instruction warrants appellate relief because some members of the jury could have convicted defendant on an invalid ground, as discussed above with respect to Richter's challenge to the sufficiency of the evidence. Accordingly, Westfield has established that the trial court plainly erred by failing to instruct the jury that it had to unanimously agree upon which predicate felony occurred in this case, this plain error affected his substantial rights, and reversal is warranted because the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Thorpe*, 504 Mich at 252-253.

## IV. CONCLUSION

In Docket No. 355577, we vacate Richter's felony-murder conviction and sentence because we cannot determine whether it was based on the predicate felony of larceny, which was not sufficiently supported by the evidence. This matter is remanded for a new trial. In Docket No. 355578, we vacate Westfield's felony-murder conviction and sentence because the Confrontation Clause was violated and because a specific unanimity jury instruction was required with regard to the predicate felony theories supporting the charge of felony murder. This matter is remanded for a new trial. On retrial, the prosecution may not proceed against defendants on a felony-murder theory premised on larceny as the predicate felony. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly